RONALD R. LEVY and ESTHER LEVY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Levy v. Commissioner
Docket No. 5928-75.
United States Tax Court
T.C. Memo 1982-419; 1982 Tax Ct. Memo LEXIS 329; 44 T.C.M. (CCH) 575; T.C.M. (RIA) 82419; 81 Oil & Gas Rep. 659; July 26, 1982. Bruce I. Hochman and Barry L. Guterman, for the petitioners. Karl D. Zufelt, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies of $367,070 and $358,334 in petitioners' Federal income tax for 1969 and 1970, respectively. After concessions, the remaining issue is the amount of deductions allowable with respect to petitioner Ronald R. Levy's participation in an oil drilling venture. The amounts deductible depend on a resolution of the following issues: (1) whether petitioners, cash basis taxpayers, are entitled to deduct amounts in excess of their cash outlay, (2) the correct timing of the deductions, and (3) whether an "operating" interest was acquired with respect to certain wells drilled. GENERAL FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Ronald R. Levy and Esther Levy, resided in Beverly Hills, Calif., when they filed their petition in this case. Hereinafter, Ronald R. Levy will be referred to as petitioner. *331 Sometime before November 1, 1969, Charles F. Raymond (Raymond), an oil and gas promoter, and Mori Aaron Schweitzer (Schweitzer), a securities salesman, organized Moray Oil Company, Inc. (Moray), a Kansas corporation, with Raymond and Schweitzer each owning 50 percent of the Moray stock. Simultaneous with its incorporation, Moray purchased all the stock of Dubros, Inc., (Dubros), a Kansas corporation. The principal assets of Dubros were oil and gas leases located in Linn County, Kansas. During the years in issue, Raymond was the president and chief executive officer of both Dubros and Moray. Raymond and Schweitzer organized the Moray Oil Program to raise capital for drilling and developing certain oil and gas leases. The various oil and gas leases involved in this case, namely the Baker, Croxton, and Stroup leases, are all located on the Cadmus Field, Linn County, Kansas. Petitioner was introduced to Raymond by his stockbroker, Schweitzer, as a potential investor who could fund the initial capital needed to begin drilling on the Cadmus Field. Persuaded by the economic substance of the program, petitioner decided to participate and thereby established himself as the pilot *332 investor from which the promoters hopefully could show an initial success and encourage further investor participation. Subsequently, a large number of investors joined with Moray to drill for oil. Over 260 different investors contributed funds to the Moray Oil Program under various limited partnership agreements in 1969, 1970, and 1971. On September 12, 1974, Moray, in both its corporate capacity and its capacity as general partner of the various limited partnerships, sold all of its interest in seventeen oil and gas leases including the Baker, Croxton, and Stroup leases to Energy Recovery, Inc.[1] The total consideration was $250,000 plus an oil payment of $4,000,000 which was to be allocated to the various limited partners of the Moray Oil Program. In a letter to petitioner's counsel in preparation for trial dated January 8, 1981, John Stark, vice-president of Energy Recovery, Inc., certified petitioner had not yet received any money with respect to the $4,000,000 oil payment, and no payment would become due under the terms of the agreement until development and operating expenses were recovered by Energy Recovery, Inc.
*333 Gross sales of oil produced on the Baker and Croxton leases were $279,476 for the period December 1969 to August 1980. The record does not disclose what part, if any, of the gross sales was credited to petitioner. In 1974, Charles F. Raymond, the promoter, was indicted by a Grand Jury in the United States District Court for the Eastern District of Pennsylvania for, interalia, diverting funds from the Moray Oil Program for purposes unrelated to drilling and completing Kansas wells. In connection with this indictment, Charles F. Raymond pled guilty and was convicted in 1975 of fraudulent sale of securities and other offenses. Deductions with Respect to Moray 1969-1, Moray Issue 1. 1969-1A, and Moray 1970-1.
FINDINGS OF FACT Petitioner's participation in the Moray Oil Program in part took the form of three limited partnership agreements called Moray 1969-1, Moray 1969-1A, and Moray 1970-1. In each of these three agreements, petitioner was the sole limited partner and Moray was the sole general partner. As is sometimes the case in the oil and gas industry, a busines entity related to the promoter performs the drilling services in connection with developing an *334 oil lease for production. In the instant case, each partnership executed "turnkey" drilling contracts with Dubros, the wholly owned subsidiary of Moray. [2]
All three limited partnership agreements contained the following common provisions. Petitioner was required to contribute a stated sum to the capital of each partnership. A portion of that stated sum was payable in cash and the remaining portion was payable by a note which, under the terms of the partnership agreements, was to be made expressly in favor of Moray. All such notes were secured by a portion of petitioner's interest in the production proceeds. The agreements provided each note and the collateral securing such note were to be fully negotiable. Although the notes were secured by a production payment, petitioner was unconditionally obligated ultimately to pay the notes in full plus interest. The partnership agreements *335 provided all expenses and income of the partnerships were allocated to petitioner. Moray contributed the drilling sites and managed the drilling operation. In addition to the above general provisions common to all three limited partnerships, the agreements contained the following terms particular to each partnership. In 1969, petitioner entered into the Moray 1969-1 and Moray 1969-1A agreements which related to the drilling of wells on the Baker lease. [3] In that same year, petitioner contributed $150,000 cash and executed a $300,000 note with respect to Moray 1969-1 and contributed $10,000 cash and executed a $20,000 note with respect to Moray 1969-1A. Both notes were secured by a production payment payable out of 70 percent of petitioner's interest in the production proceeds. The notes bore interest at 9 percent per annum and were payable on or before 10 years from the dates of execution. [4] Moray contributed 75 percent of its working interest in the drilling sites located on the Baker lease to those partnerships. *336 Both partnerships, Moray 1969-1 and Moray 1969-1A, executed a turnkey drilling contract with Dubros for the fixed price of $12,500 per well payable at the completion of each well by $5,000 cash and assignment of a $7,500 note payable out of the net working interest in the well. [5]
In 1970, petitioner entered into the Moray 1970-1 agreement relating to the drilling of wells on the Croxton lease. [6] With respect to that agreement, petitioner, in 1970, paid $90,000 cash to Moray and executed a $360,000 note carrying 9 percent interest per annum and payable on or before 10 years from the date of execution. Petitioner authorized Moray to distribute his share of proceeds as follows: (1) 90 percent to petitioner until he was paid the sum of $90,000 during which time the remaining 10 percent was to be credited against the $360,000 note, and (2) once the $90,000 cash contribution was paid off, 50 percent to petitioner and the remaining 50 percent to be credited against the balance of the $360,000 note until it is fully discharged. After petitioner's $360,000 note *337 was paid off, Moray held the right to convert a 3-1/4 percent overriding royalty interest into a 50 percent working interest. Unlike the agreements relating to the Baker lease, supra, Moray contributed the entire 100 percent working interest in drilling sites on the Croxton lease. Moray 1970-1 entered into a drilling contract with Dubros calling for a turnkey price of $15,000 per well payable upon completion of the well by $5,000 cash and assignment of a $10,000 note payable out of the net working interest in the well. [7]
To summarize, petitioner contributed cash and notes as follows: Date of
Partnership
Cash
Note
Execution of Note
Term
Moray 1969-1
$150,000
$300,000
November 3, 1969
10 yrs.
Moray 1969-1A
10,000
20,000
December 29, 1969
10 yrs.
Moray 1970-1
90,000
360,000
May 4, 1970
10 yrs.
With the exception of oil production payments, if any, which may have been credited, petitioner had made no cash payments of principal or interest on the notes as of the date of trial, even though payment was due. *338 Nor had any demand for payment been made on petitioner with respect to those notes. At the time the agreements were executed, the parties believed production proceeds would be sufficient to pay the notes. As it turned out, drilling costs exceeded the parties' initial expectations, and Moray paid those additional costs. Thirty-three (33) wells were drilled on the Baker lease and twenty-nine (29) wells were drilled on the Croxton lease pursuant to the agreements between Moray and petitioner. Payments were generally made as drilling was performed. On the average, work on the 33 wells drilled on the Baker lease had progressed through perforation of casing by the end of 1969. Those wells were completed in spring 1970. Twenty of the wells drilled on the Croxton lease were completed in 1970 and nine were completed in 1971. Actual intangible drilling costs on those wells equaled or exceeded petitioner's cash outlay. Two documents entitled "Declaration of Interest" were filed in the Linn County recorder's office on June 1, 1970. In one document, Moray recognized the existence of petitioner's interest in 33 wells drilled on the Baker lease, and in the other document, Moray recognized *339 petitioner's interest in 29 wells drilled on the Croxton lease. Petitioner is a cash basis taxpayer. A timely election was made under section 263(c) [8] to expense intangible drilling and development costs (IDCs). The parties stipulated records of transactions are unavailable despite repeated attempts to obtain them. [9]
On their 1969 and 1970 Federal income tax returns, petitioners deducted, as their distributive share (100%) of partnership loss, the following amounts: Lease
Partnership
Year
IDCs
Depreciation [10]
Total
Baker
Moray 1969-1
1969
$480,000
$4,480
$484,480
and
Moray 1969-1A
Croxton
Moray 1970-1
1970
421,875
3,938
425,813
*340 In his notice of deficiency, respondent disallowed the above claimed deductions in their entirety, since, interalia, the partnership failed to show that any oil or gas wells were drilled. On brief respondent recognizes petitioner acquired an interest in 33 wells drilled on the Baker lease and 29 wells drilled on the Croxton lease. Thus, respondent allows deductions with respect to those wells. However, respondent proposes to limit those deductions (1) to drilling costs actually expended and (2) to petitioner's cash outlay. Respondent also proposes to postpone any otherwise allowable deductions to later taxable years. OPINION Limitation of Deductions to Cash Investment
It is undisputed that, with respect to the wells drilled on the Baker and Croxton leases, an "operating" interest was acquired entitling petitioner to expense IDCs. See sec. 1.612-4(a), Income Tax Regs. Nor is it questioned that a proper election to expense IDCs was made. See sec. 263(c). Respondent argues the actual amount of IDCs incurred with respect to the wells on the Baker and Croxton leases was less than petitioner's cash outlay and, thus, proposes to limit petitioner's deductions to that *341 amount. Respondent also argues petitioner's deductions are limited to his cash investment. [11] We have already made as a finding of fact that the actual IDCs expended on those wells equaled or exceeded petitioner's cash outlay.Thus, the only remaining issue is whether petitioners, cash basis taxpayers, are entitled to deduct amounts greater than their cash outlay. To the extent the cost of drilling exceeded petitioner's cash investment, Moray paid that additional cost. Both parties implicitly agree the result depends on whether those amounts paid by Moray are to be treated as, or were intended to be, amounts loaned to petitioner. Respondent claims no such loans were ever intended and those amounts were paid, instead, on behalf of Dubros in satisfaction of Dubros's own obligation to drill. For the following reasons, we agree with respondent. Whether Moray intended those payments to be loans to petitioner is a question of fact. The burden is on petitioner to show such intent. Rule 142 (a). Respondent's contention that Moray made the payments on behalf of Dubros is well-founded. Under *342 the "turnkey" drilling contracts, Dubros was unconditionally obligated to drill the wells in the first instance. Whereas Dubros's obligation was current, petitioner was obligated in no way to pay any amount outside of production proceeds whatsoever for ten years. [12] Clearly, Dubros had a far more pressing need for current funds. Moreover, Moray and Dubros were closely related corporations whose interests are difficult to distinguish by the manner in which they were operated. Charles F. Raymond and Mori Aaron Schweitzer each owned 50 percent of the stock of Moray, and Dubros was *343 the wholly owned subsidiary of Moray. Both corporations were actively involved in the drilling venture, and there is no showing either corporation had any interests outside the subject drilling program. Raymond, as president and chief executive officer of both corporations, made the business decisions for each corporation. What little evidence is before us indicates the drilling operation was conducted with little regard for the separate existence of each corporation. Petitioner's cash contributions were sometimes deposited directly into Dubros's account and sometimes into Moray's account. Even Raymond, with personal knowledge of the business operations of Moray and Dubros, testified "a lot of Dubros's bills were paid directly by Moray." In light of Dubros's current and unconditional obligation to drill, the common control under which Moray and Dubros existed, and the apparent disregard for the separate existence of each corporation (e.g., the direct payments made by Moray of Dubros's bills), lends support to respondent's contention that any amounts advanced by Moray were made on behalf of Dubros. Furthermore, the parties did not contemplate Moray would advance any drilling *344 costs. Moray is not shown to have a reserve of capital with which to loan drilling funds. Moreover, when drilling costs exceeded the parties' initial expectations and Moray advanced the needed funds, the conclusion is inescapable that the source of the funds advanced by Moray was from other investors' contributions. Moray diverted those funds to complete petitioner's wells. It is apparent no loan to petitioner was ever intended. Petitioner points to the notes he executed and to his agreement to bear all expenses. However, those facts, without more, do not convince us Moray intended the amounts so advanced to be loans to petitioner. Those notes evidence a pre-existing commitment by petitioner to pay a stated sum by a certain date-- ten years from the dates of execution--regardless of the cost of drilling.Interest accrued at nine percent per annum on those notes and was, likewise, not due until the end of the ten-year period.When Moray advanced drilling costs, petitioner's position remained essentially unchanged. He was liable for the same amount which was due at the same time, and interest continued to accrue at the same rate. To be sure, had petitioner borrowed money from *345 an independent lender, his position would have been substantially different. He would not only be liable on the notes to Moray but he would also be liable to the lender for the principal amount of the loan and for interest on that loan. Moreover, from Moray's viewpoint, it made no economic sense to make the payments on behalf of petitioner. Moray was guaranteed the amounts of petitioner's notes plus interest irrespective of any amounts Moray might advance. Moray did not improve its position with respect to petitioner by making the payments on behalf of petitioner. The only result of Moray's advances was that Dubros obtained the necessary funds to complete the wells. We view the transactions herein as nothing more than an inter-corporate transfer of funds between related corporations in order that one of the corporations could satisfy its own obligation to drill wells for a fixed price. Petitioner would have us presume a loan was made to himself when Moray paid the additional drilling expenses. We are not prepared to do so. We are of the opinion Moray advanced the funds on behalf of its wholly owned subsidiary, Dubros, in order that Dubros could satisfy its obligation to drill *346 the wells, and no loan was intended to be made to petitioner. [13] As a consequence of our finding that no loan was made to petitioner, we hold petitioner has not made the requisite payment to secure a deduction as a cash basis taxpayer. [14]
*347 Petitioner gave notes for which he had no obligation to pay for ten years and for which no demand had been made after the maturity dates of those notes. A cash basis taxpayer is denied a deduction for payment by a note. Helvering v. Price,309 U.S. 409 (1940); Eckert v. Burnet,283 U.S. 140 (1931). The concern here is that "the note may never be paid, and if it is not paid, the taxpayer has parted with nothing more than his promise to pay." Don E. Williams Co. v. Commissioner,429 U.S. 569, 578 (1977), quoting Hart v. Commissioner,54 F.2d 848, 852 (1st Cir. 1932). Thus, we hold petitioner is not entitled to deduct amounts in excess of his cash investment. [15]
*348 Timing
With respect to Moray 1969-1, Moray 1969-1A, and Moray 1970-1, we have found petitioners are entitled to deduct IDCs up to the amount of their cash investment. The only issue remaining is the proper taxable year for taking those deductions. If a taxpayer elects to expense IDCs, the appropriate year of deduction is determined pursuant to section 461 and the regulations thereunder. Keller v. Commissioner, 78 T.C.     (July 8, 1982); Stradlings Building Materials, Inc. v. Commissioner,76 T.C. 84, 86 (1981). Section 461(a) provides any deduction shall be taken for the taxable year under the method of accounting used in computing taxable income.A cash basis taxpayer shall take a deduction in the taxable year in which paid. Sec. 1.461-1(a), Income Tax Regs.
Petitioners made cash payments in 1969 of $150,000 and $10,000 in connection with Moray 1969-1 and Moray 1969-1A, respectively. Petitioners made a cash payment of $90,000 in 1970 with respect to Moray 1970-1. Similarly, Moray paid over to Dubros the cash contributions petitioners made in the same year petitioners made their cash investments. [16] Work on Moray 1969-1 and Moray 1969-1A had *349 progressed through perforation of well casing by December 31, 1969, and the wells were completed by spring 1970. With respect to Moray 1970-1, 20 wells were completed in 1970 and drilling had begun on nine wells which were completed in 1971. Applying the above accounting rules, we find cash payments were made of $160,000 in 1969 and $90,000 in 1970, and petitioners are entitled to take their deductions in those years. This result obtains whether or not the relationship between Moray and petitioner constituted true partnerships for Federal tax purposes. [17] See note 15, supra.
Respondent's only *350 contention is that no deduction is allowable until the wells were completed since, by the very terms of the drilling contracts, payment was not due "until completion of the wells." [18] Yet, respondent cites no authority holding that a deduction must necessarily be postponed until, by the terms of the contract, payment is due. As substantial drilling services were performed in the year of payment, we find a valid business reason existed for making such payments. See Van Raden v. Commissioner,71 T.C. 1083 (1979), affd. 650 F.2d 1046 (9th Cir. 1981); Pauley v. United States,11 AFTR 2d 955, 63-1 USTC par. 9280 (S.D.Cal. 1963); Dillingham v. United States,48 AFTR 2d 81-5815, 81-2 USTC par. 9601 (W.D. Okla. 1981). [19] We do not see, in this case, a potentially abusive situation wherein a taxpayer has prepaid an expense in order to secure a deduction in an earlier year.Thus despite the terms of the contracts, we allow the deductions when the payments were made. [20]
*351 Issue 2. Deductions with Respect to Moray 1970
FINDINGS OF FACT Petitioner entered into a fourth and final limited partnership agreement entitled Moray 1970. That agreement was similar in most respects to the three previous agreements. Petitioner was the sole limited partner and Moray Producer's 1970, Inc. was the sole general partner. The agreement related to the drilling of ten (10) wells. However, unlike the prior three agreements, this agreement indicated no lease or other location where those ten wells were to be drilled. With respect to Moray 1970, petitioner executed notes of $10,000 and $115,000 carrying 9 percent interest per annum and payable on or before 10 years from September 15, 1970--the date of executions. The $115,000 note was secured by a production payment payable out of 10 percent of petitioner's interest. In 1971, petitioner paid in full the $10,000 note. On their 1970 Federal income tax return, petitioners deducted $117,187 as the intangible costs of drilling ten wells on the Stroup lease. In his notice of deficiency, respondent disallowed those deductions since the partnership, Moray 1970, failed to show it had an "operating" interest in the *352 ten wells drilled on the Stroup lease. The issue is whether the partnership or petitioner acquired such an operating interest in the 10 wells drilled on the Stroup lease. In order to be entitled to a deduction for intangible drilling costs, a taxpayer must qualify as an "operator," which means he must have a working or operating interest in an oil or gas well. Sec 1.612-4(a), Income Tax Regs. To be an "operator," a taxpayer must establish, at the minimum, a link between specific contracts and himself with specific wells or drilling operations. Cottingham v. Commissioner,63 T.C. 695, 707 (1975). The burden is on petitioner to establish such an operating interest. Rule 142(a). The partneship agreement makes no reference to the Stroup lease. That agreement simply calls for the drilling of ten wells without mentioning either a specific location or a particular lease where those wells were to be drilled. Nor does the drilling contract between the partnership and Dubros make reference to the location of those ten wells. Moreover, no "Declaration of Interest" was filed in the county recorder's office recognizing petitioner's interest in those ten wells. [21] The *353 entire program consisted of a large number of investors joining with Moray under similar limited partnership agreements. Wells were drilled on ten different leases in 1969, 1970, and 1971 under the program. The drilling venture experienced a rapid deterioration when financial and related difficulties beset the program. It is apparent that any internal structure or definition the Moray Oil Program may have had at one time had rapidly deteriorated by the time petitioner made his investment with respect to the partnership Moray 1970.Petitioner has come forward with no reliable evidence to link or trace either his particular investment or the partnership Moray 1970 with the Stroup lease or with specific wells located on the Stroup lease. The record does not support a finding that petitioner acquired an operating interest in the ten wells located on the Stroup lease. Thus, with respect to those ten wells, we disallow all deductions for the intangible drilling and development costs claimed by petitioner. [22]
*354 To reflect concessions and the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Westland Minerals Corp., of which Charles F. Raymond was president, was by now the sole stockholder of Moray and was also a named seller in this transaction. Also named as sellers in this transaction were subsidiary corporations of Moray--Moray Producers 1969 Inc., Moray Producers 1970 Inc., Moray Producers 1971 Inc., and Dubros, Inc.↩
2. A turnkey contract is a contract in which the drilling contractor undertakes for a fixed price to furnish all materials and labor and to do all the work required to complete a well, place it on production, and turn it over ready to "turn the key" and start oil or gas running into the tanks.↩
3. The Moray 1969-1 and Moray 1969-1A agreements referred to the drilling of 30 wells and 2 wells, respectively. ↩
4. The terms of the $300,000 and $20,000 notes executed in 1969 were originally five years. Due to delays in drilling, the terms of those notes were extended to ten years soon after their execution.↩
5. The record does not disclose whether the note was payable only out of production or without regard to production.↩
6. The Moray 1970-1 agreement referred to the drilling of 30 wells of the Croxton lease. ↩
7. See note 5, supra.↩
8. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
9. It has also been suggested to the Court those records were used for the indictment and conviction of Charles F. Raymond in 1974 and 1975, and the parties have been unable to retrieve them.↩
10. The parties have stipulated as to the amount of tangible costs expended with respect to each lease and the proposed method of calculating depreciation on that tangible equipment.↩
11. Respondent's claim that the drilling contracts were invalid is without merit.↩
12. All notes were payable "on or before" ten years from the dates of execution. An instrument payable on or before a specified date gives the maker an option to pay at an earlier date.The instrument does not mature until the expiration of such time. 10 C.J.S. Bills and Notes section 246 (1938). As president of Moray, Raymond, testified, "I think that there was always the possibility that if the wells didn't fund the notes by the time they ultimately became due, that we could have called upon [petitioner] to pay them." Clearly, petitioner was not required to pay on the notes for ten years.↩
13. See Rife v. Commissioner,356 F.2d 883 (5th Cir. 1966), affg. in part and revg. in part 41 T.C. 732 (1964); Vanderlaan v. Commissioner,T.C. Memo. 1962-130. See also Bush v. Commissioner,T.C. Memo. 1964-16. Cf. McAdams v. Commissioner,15 T.C. 231 (1950), affd. 198 F.2d 54↩ (5th Cir. 1952). 14. Due to our holding, we need not decide whether expenses incurred in installing pipelines used to transport water and intert gas injectants incidental to a secondary method of recovering oil and gas are intangible drilling and development costs subject to the option to expense under sec. 1.612-4, Income Tax Regs.↩ Notwithstanding those costs, sufficient IDCs have been incurred to entitle petitioner a deduction to the extent of his cash investment. For the same reason, we need not reconstruct actual drilling costs. Moreover, in the event petitioner's deductions are limited to his cash investment, respondent makes no claim those deductions should be allocated between tangible and intangible drilling costs. Thus, we allow a deduction for the full amount of petitioner's cash outlay. We make this conclusion keeping in mind petitioner acquired a 75 percent fractional interest in wells drilled on the Baker lease.
15. There is a question of whether the relationship between Moray and petitioner constituted for Federal tax purposes a partnership, an agency, or merely an agreement by petitioner to hire Moray and Dubros to perform drilling services. Our conclusion that Moray advanced the funds not as a loan to petitioner, but rather on behalf of Dubros renders this question moot. Moreover, there is no evidence or assertion the amounts were either loaned or contributed by Moray to the partnership. In fact the partnership agreements provided "The General Partner shall not contribute to the capital of the Limited Partnership in cash * * *." Thus, Moray's payments did not constitute payments by the partnership. Furthermore, we need not determine the effect of the following partnership provisions, "[e]ach of the parties hereto elects under the authority of Section 761(a) * * * to be excluded from the application of all of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code of 1954." See sec. 1.761-2(b)(2)(ii), Income Tax Regs.↩
16. Petitioners paid $10,000 with respect to Moray 1969-1A directly to Dubros on December 30, 1969.↩
17. A partnership on the cash basis method of accounting takes deductions for the year payments are made by the partnership. Stradlings Building Materials, Inc. v. Commissioner,76 T.C. 84 (1981); Resnik v. Commissioner,66 T.C. 74 (1976), affd. per curiam 555 F.2d 634↩ (7th Cir. 1977). There is nothing in the record to indicate the partnerships computed their income by any method other than the cash basis method of accounting.
18. In his notice of deficiency, respondent determined petitioner's method of accounting did not clearly reflect income. Respondent had since abandoned that argument. Respondent also argued the payments constituted refundable deposits since they were made before the due dates on the contracts. However, there is nothing in the record to indicate such payments were refundable or that the money was not "irretrievably out of pocket." See Ernst v. Commissioner,32 T.C. 181, 186↩ (1959). There were no contractual provisions regarding refunds and, certainly, petitioner never expected to receive one. 19. In Van Raden v. Commissioner,71 T.C. 1083 (1979), affd. 650 F.2d 1046 (9th Cir. 1981), we expressly left open the question of whether a deduction is allowable for a prepaid business expense absent a business purpose for such prepayment. See Schenk v. Commissioner,T.C. Memo. 1980-531↩. 20. See also Rev. Rul. 71-579, 1971-2 C.B. 225, wherein, under the terms of the drilling contract, no payments were required until wells were drilled to a predetermined depth. The taxpayer made payments to the drilling contractor in the taxable year prior to the year the well was drilled to the specified depth.That ruling held no deduction was allowed in the year of payment. However, no work had yet been performed under the contract in such year of payment. In this case, substantial drilling services had actually been performed in the year of payment. See also Rev. Rul. 71-252, 1971-1 C.B. 146↩.
21. These facts are in sharp contrast to facts relating to the Baker and Croxton leases for which respondent does not deny petitioner acquired such an "operating interest." In both of those leases, the partnership agreements make reference to the specific lease where the wells were to be drilled and Declarations of Interest recognizing petitioner's interest in a specific number of wells on those particular leases were filed with the county recorder. ↩
22. See also Puscas v. Commissioner,T.C. Memo. 1978-73, wherein a taxpayer in the same drilling program (the Moray Oil Program) was found not to have acquired an "operating" interest within the meaning of sec. 1.612-4(a), Income Tax Regs.↩